**UTAH STATE FARM BUREAU FEDERATION et al. v. NATIONAL FARMERS UNION SERVICE CORP. et al.**

No. 4374.

United States Court of Appeals
Tenth Circuit.

June 11, 1952.

Rehearing Denied July 25, 1952.

A. H. Nebeker, Salt Lake City, Utah, (C. N. Ottosen, Salt Lake City, Utah, on the brief), for appellants.

Warwick C. Lamoreaux, Salt Lake City, Utah, and Quentin Burdick, Jamestown, N. Dak., for appellees.

Before BRATTON, HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

National Farmers Union Service Corporation, National Farmers Union Life Insurance Company, and Farmers Educational and Co-Operative Union of America, commonly known and referred to as the "Farmers Union" brought this action in the United States District Court of Utah against the Utah State Farm Bureau Federation, commonly known and referred to as the "Farm Bureau"; Frank G. Shelley, its Executive Secretary; and A. V. Smoot, to recover compensatory damages for an

alleged defamatory publication by the Farm Bureau, in which the Farmers Union was referred to as "communist dominated." By answer, defendants admitted the publication but pleaded defensively, fair comment in the public interest and truth. The trial court held as a matter of law that the words "communist dominated" were libelous per se, leaving to the jury the clear-cut issues whether the libelous statement was true or false, and if false, whether its publication resulted in damages to the plaintiffs. The jury resolved the issues in favor of the plaintiffs, awarded damages in the sum of $25,000, and defendants have appealed.

The alleged libelous language published by the Farm Bureau was prompted by its interest in the Utah political campaign of 1950. On October 11 of that year, appellant Frank Shelley, as Secretary of the Farm Bureau, caused a two-page letter with a two-page mimeographed enclosure to be sent to the members of the Farm Bureau's Board of Directors reflecting the action of the Board at a previous meeting. Among other things, the letter stated that "2—The Board decided to take vigorous action with regard to candidates for election to National, State and County Offices. A Mimeograph copy of this action with explanations is enclosed * * * 8— Copies of the Congressional Record in which Senator Styles Bridges made his statement concerning Farmers Union and Arthur Gæth were distributed. (Copies of this statement are available at the State Office in any number you desire.)" The mimeographed enclosure was headed "Farm Bureau Position on Election of Senator & Congressman." After referring to the Granger Bill, it stated in opposition thereto that "Representative Granger has exhibited his evident animosity toward farm organizations (except the communist dominated Farmers Union)." Shelley not only caused publication of the mimeographed document by mailing it to the members of the Board of Directors, but he also caused it to be published in certain Utah newspapers.

Utah has statutorily defined libel as "a malicious defamation * * * tending to * * * impeach the honesty, integrity, virtue or reputation * * * of one who is alive, and thereby to expose him to public hatred, contempt or ridicule." Utah Code, Annot.1943, 62–2–2. See also Restatement of Law of Torts, Sec. 559. And, generally, "One who falsely, and without privilege to do so publishes of a corporation for profit matter which tends to prejudice it in the conduct of its trade or business or to deter third persons from dealing with it, is liable to the corporation." Restatement of Law of Torts, Sec. 561. See also Section 558.

■ The Utah statute also specifically defines communications which are absolutely privileged and not to be considered libelous per se. Utah Code Annot.1943, 62–2–3. Appellants do not claim absolute privilege for their publications. They do claim, however, a qualified or conditional privilege, which they say under the facts entitle them to a directed verdict. The Utah courts, following the great weight of authority, hold that publications dealing with political matters, public officials or candidates for office, are entitled to a measurable privilege because of the public interest involved. As to this class of publications, the law raises a prima facie presumption in favor of the privilege. Williams v. Standard-Examiner Publishing Co., 83 Utah 31, 27 P.2d 1; Derounian v. Stokes, 10 Cir., 168 F.2d 305.

■ The question whether the comment on or criticism of matters of public concern are fair and privileged, or malicious and libelous, is usually a question to be determined by the jury under all the circumstances, subject of course to the control of the court. Restatement of Law of Torts, Sections 614 and 618.

Appellants do not claim that Mr. Granger's candidacy for Congress in Utah made anything said of the Farmers Union privileged. They take the position, however, that when the challenged statement is considered in connection with the Bridges speech, as it was intended and would have been understood by the reader of the letter and enclosure, the language relating to the Farmers Union was fair comment in the public interest and conditionally privi--

leged. It is said that Senator Bridges' speech on the public activities of the Farmers Union would have been privileged if given outside the protection of the Senate Floor, and the statement of the defendants was equally privileged because it was in effect only a repetition of the Bridges speech. And see Huxman concurring specially in Derounian v. Stokes, supra, 168 F.2d at page 308. On this postulate, appellants argue that the published statement was not libelous per se and the trial court erroneously so instructed the jury.

 It is the law of Utah and elsewhere, that matters and things referred to in the alleged libelous publication, as the source of the statement, may be introduced in the libel action for the purpose of showing that the publication or any portion thereof is a fair and true report of the matter referred to. This being so, the publication is privileged to the extent that no malice will be inferred from the mere fact of publication, and the prosecution must affirmatively show express malice to recover. People v. Glassman, 12 Utah 238, 42 P. 956.

 Shelley's covering letter did not enclose the Bridges speech, nor did it or the enclosure purport to quote from the speech or refer to it as authority for the statement that the Farmers Union was communist dominated. But even so, " 'to state matters which are libelous is not comment or criticism.' " Williams v. Standard Examiner Publishing Co., supra [83 Utah 31, 27 P.2d 15.] The law draws a clear distinction between criticism or comment, which may or may not be privileged, depending upon the circumstances in which it was uttered, and publication of an unequivocal and unambiguous fact, the legal import and effect of which is a question of law for the courts to decide, leaving only its truth or falsity for the determination of the jury. Wright v. Farm Journal, 2 Cir., 158 F.2d 976; Spanel v. Pegler, 7 Cir., 160 F.2d 619, 171 A.L.R. 699. If the published statement is libelous as a matter of law, it is no defense that it was repeated from another source. Restatement of Law of Torts, Sections 578, 580 and 581. It

follows that the appellants can claim no conditional privilege from a reference to the Bridges speech if the statement is libelous per se.

Adopting the dictionary definition of "dominated," the trial court instructed the jury that "The label of 'Communist' today, in these times in which we live, in the minds of average and respectable persons, places the plaintiffs beyond the pale of respectability and makes them a symbol of public hatred, ridicule or contempt. * * " And, " * * * to designate plaintiffs herein as 'communist dominated' is to cripple the functioning and damage the reputation of those organizations in the communities in which they do business. * * *."

 While the Utah courts have not had occasion to construe the words "communist dominated" under the legislative definition of libel, it is now the generally accepted view that to write or speak of a person or an organization as being "communist" or a "communist sympathizer" is to subject such person or organization to public hatred, odium and contempt, to his immediate harm, and is therefore libelous per se. See Joint-Anti Fascist Refugee Commission v. McGrath, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817; Spanel v. Pegler, 7 Cir., 160 F.2d 619; Grant v. Reader's Digest, 2 Cir., 151 F.2d 733; Wright v. Farm Journal, 2 Cir., 158 F.2d 976; Cole v. Loew's Inc., D.C., 8 F.R.D. 508; Gallagher v. Chavalas, 48 Cal.App.2d 52, 119 P.2d 408; Toomey v. Jones, 124 Okl. 167, 254 P. 736, 51 A.L.R. 1066. Construing Utah law, we have held that to speak of one as pro-Nazi or pro-Fascist was libelous per se and not within the rule of conditional privilege. Derounian v. Stokes, supra. In the temper of the times, the communist label is even more odious and defamatory than the pro-Nazi and pro-Fascist label of another day. Furthermore, to call someone or refer to him as "communist dominated" is a statement of a bald and unambiguous fact. It is not a criticism or comment on an acknowledged or accepted fact. We think the trial court's instructions correctly stated applicable law under the facts.

Appellants sought to prove that the Farmers Union was in truth Communist domi-

nated by offering a mass of testimony and exhibits, all intended to show that the economic and political theories and policies of the Union were similar or parallel to the doctrines and teachings of the Communist Party; and that such policies were formulated and advocated by those in the Union who were or had been closely identified with the Communist Party.

To show ideological similarity, appellees offered and the court received in evidence an undated speech by Farmers Union President Patton, in which he assailed the profit system and arraigned the landless against the landed. He called for cooperative as against corporate farming, and made an impassioned appeal for a closer and more militant organization of the small and the tenant farmer. Undoubtedly the speech, which was widely distributed in pamphlet form, was, in the vernacular of the day, "left of center."

The court also admitted in evidence a pamphlet by Stanley Vogt called the "Last Frontier." It was copyrighted in 1948 and published and circulated by the Union. Vogt was not identified as a Communist, but some of the authors of books recommended for reading in the pamphlet were identified as Communist or ex-Communist. This pamphlet also assailed the profit system as vicious and unworkable. It laid all of the problems of agriculture at the door of the competitive system. It decried the "coalition" of the two old political parties as an unholy alliance, and attacked the Eightieth Congress' aid to Greece, Turkey, Iran and China as military support for the maintenance of kings and dictators. It deplored the "smear campaign" which called any leader with progressive ideas "red, subversive or un-American." In sum, it is fair to say that the pamphlet was violently critical of foreign aid under the Marshall Plan, and advocated closer ties with Russia.

The court excluded other proffered newspaper articles, pamphlets and books of the same tenor for lack of foundation, hearsay, remoteness of time, or because the court deemed them immaterial. Noteworthy of these exhibits were several articles, purportedly from newspapers published and distributed by local or area chapters and branches of the Farmers Union. Particularly, the court excluded newspaper articles by the Eastern and Northeastern Divisions of the Union, headed by Mr. Archie Wright, who was identified in the record as having close ties with the Communist Party. In excluding these exhibits, the court took the view that they were independent and autonomous publications without authority to speak for or control the policies of the national organization.

The court excluded all documents offered as emanating from Communistic sources, primarily on the grounds that they were not properly identified as Communistic material, lack of proper foundation, and remoteness of time. The appellants were permitted to show by testimony of self-confessed ex-Communist witnesses, that several parties who had been connected with the Union were also members of or closely affiliated with the Communist Party. They also testified of the policy of the Communist Party, to capture the Farmers Union by process of infiltration. These witnesses had not been members of the Communist Party since the Thirties, but they professed to have followed the Communistic tactics after leaving the Party. The court excluded some testimony tending to connect Farmers. Union representatives with the Communist Party as too remote in time and based on hearsay, and because those identified as having Communistic ties were not shown to have ever exercised any control over the Union's policies, especially at the time of the publication.

■ It may be conceded that as master of the trial, we would have admitted some of the excluded evidence. But we do not pause to decide which, if any, of the excluded documents or bits of testimony were legally admissible as having some relevant bearing on the issue of truth. We are reminded that lawsuits are not tried according to a mathematical formula, and that the admission or exclusion of evidence is largely within the province of the trial judge. "The judge may in his discretion exclude evidence if he finds that its probative value is outweighed by the risk that its admission will * * *

create substantial danger of undue prejudice or of confusing the issues or of misleading the jury \* \* \*." Rule 303, A.L.I. Model Code of Evidence. "Dialectical perfection, metaphysical nicety, abstract inerrancy, are not expected or required of Federal trial courts." Dallas Ry. & Terminal Co. v. Sullivan, 5 Cir., 108 F.2d 581, 584. In determining whether or not the trial court committed error in the admission or exclusion of evidence, appellate courts will look only to the question whether there was a manifest injustice. Wigmore 2d Ed., pp. 121, 122, 166, 167, 168; Thatenhorst v. United States, 10 Cir., 119 F.2d 567.

█ In the course of the trial, counsel for appellants conceded the circumstantial and hearsay character of much of the excluded testimony, but insisted that it was competent to "build up a general picture \* \* \* over a long period of time." The trial court, however, took the position that the appellants should first show a current relationship between the Communist Party and the Union "before you get out on the fringe." Having regard to the latitude accorded the trial court in the order of proof, and the admission of circumstantial evidence, we cannot say that the exclusion of this evidence was so clearly erroneous as to work a manifest injustice.

█ The appellants offered in evidence, and the court rejected, third party documents in mitigation of damages. This material, consisting of newspaper articles and the Congressional Record of Senator Bridges' speech, all referred to the Farmers Union as under the domination or influence of the Communist Party. And, appellants contend that these articles and documents were competent evidence from which the jury could find that any damage appellees might have suffered was not wholly caused by the publication in issue.

In Hartmann v. American News Co., 7 Cir., 171 F.2d 581, the appellate court sustained the trial court's admission of contemporary publications of like tenor in mitigation of damages for libel per se. But, the weight of authority is to the effect that contemporary libels are not admissible to mitigate damages for libels per se. 74 A.L.R. 732, 735; Behrendt v. Times-Mirror Co., 30 Cal.App.2d 77, 85 P.2d 949. It is said that "libels by the others neither add to nor detract from the wrong of the defendant. Consequently, it cannot be material whether these other wrongful acts have been committed previously or subsequently to that of the defendant, unless the proposition can be maintained that the reputation of the aggrieved party, having already been shattered by the previous libels, is less susceptible of further injury, and therefore that the evidence should be admitted as tending to reduce the damages. The answer to this proposition is that it is purely hypothetical, and is without any sanction in practical experience." Sun Printing & Publishing Ass'n v. Schenck, 2 Cir., 98 F. 925, 927. "Mitigation extends or relates only to punitive or exemplary damages." Kehoe v. New York Tribune, 229 App.Div. 220, 241 N.Y.S. 676, 680; Oklahoma Publishing Co. v. Givens, 10 Cir., 67 F.2d 62; Abell v. Cornwall Industrial Corp., 241 N.Y. 327, 150 N.E. 132, 43 A.L.R. 880.

The trial court instructed the jury that the appellees were entitled to recover "only those damages that flow from the defamatory statements the defendants published." It excluded the Bridges speech because it would be unfair to allow the appellants to avail themselves of a publication which their agent had prepared and submitted for delivery on the Senate Floor. The ruling of the court finds support in the weight of authority and the exclusion of the third party documents was not error.

On the whole record, we conclude that the judgment of the court is not clearly erroneous and it is affirmed.